UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

OLLIE HERRIN and PANSY HERRIN

        Plaintiffs,

v.

        Case Number 05-10245
        Honorable David M. Lawson
        Magistrate Judge Charles E. Binder

TROOPER ROBERT DUNHAM,
DETECTIVE MARK PENTIGRAPH a/k/a
MARK PENTIGRAFF, MICHIGAN STATE
POLICE, MARK REENE, and TUSCOLA
COUNTY,

        Defendants.
_____/

## OPINION AND ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION IN PART AND GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT, AND DISMISSING CASE

        The plaintiffs have brought an action alleging that certain county and state officials violated their constitutional rights when they seized certain property – initially without a warrant – pursuant to a criminal investigation for fraud. The equipment was seized on July 13, 2001, most of it was returned to the plaintiffs after a state judge so ordered on or about January 19, 2005, and the plaintiffs filed their two-count complaint in this Court on September 15, 2005. In a previous order, the Court rejected the magistrate judge's suggestion that the case was barred by the statute of limitations because the retention of the property amounted to a continuing violation, which rendered the complaint untimely. The defendants filed new motions for summary judgment following completion of discovery. On March 17, 2008, the magistrate judge filed a report recommending that the motions be granted and the case dismissed. He concluded that the statute of limitations began to run when the property was first seized and it had expired by the time the complaint was filed; the defendants were entitled to sovereign immunity under the Eleventh Amendment because the

plaintiffs' attorney admitted in pleadings and at oral argument that the defendants all were sued in their official capacities; the defendants were *not* entitled to prosecutorial immunity; and the county defendant is not vicariously liable for the acts of its agents. The plaintiff filed timely objections to the recommendation.

The Court has reviewed the file, the report and recommendation, the defendants' objections, and has made a *de novo* review of the record in light of the parties' submissions. The Court now concludes that although the law of the case doctrine normally would preclude revisiting the statute of limitations issue, a Supreme Court case decided since the last order in this case sheds new light on the issue and convinces the Court that the continuing violation rule does not apply to the illegal seizure in this case. The Court finds it unnecessary to address the other issues raised in the report and recommendation or in the plaintiffs' appeal of the magistrate judge's order denying their motion to amend their complaint. Therefore, the Court will adopt the magistrate judge's recommendation, grant the motions for summary judgment, and dismiss the case.

I.

The origins of this case are found when trooper Robert Dunham of the Michigan State Police began investigating what he described as a "gypsy" fraudulent paving scheme.[1] State Def.'s Mot. for Summ. J., Ex. E; State Def.'s Mot. for Summ. J., Ex. G, Pendergraff Dep. 5-6. On July 11, 2001,

---

[1] Gypsy is a term given the ethnic group "Roma." Walter Otto Weyrauch & Maureen Anne Bell, *Autonomous Lawmaking: The Case of the "Gypsies"*, 103 Yale L. J. 323, 323 n. 1 (1993). However, people attribute certain negative stereotypes to members of this ethnic group, and use of the word "gypsy" has become a colloquial way to accuse someone of possessing a negative characteristic associated with this stereotype. *Id.* at 334-36. The term is thought by sensible people to be quite offensive when used in this manner. The plaintiffs deny being gypsies or any other ethnic minority. Pl.s' Resp. to Mot. for Leave to File Ans., Ex. 3, Pansey Herrin Dep. 16.

he received a complaint from Terry Coutcher about the paving that had been partially completed on his driveway. Mr Coutcher was approached by an older man who had stated that he would pave the driveway for $5,500. Mr. Coutcher concluded that this was a good deal after the man drove him to 4576 Murphy Lake (referred to as "the Hornfield residence") to show off his prior work, and agreed to the price. The work was begun, but Mr. Coutcher became dissatisfied. He contacted trooper Dunham, who came to the scene. The asphalt, according to Dunham's report, was "thin, cracking and uneven" and "[i]t was obvious . . . that there was inferior workmanship on the asphalt." State Def.'s Mot. for Summ. J., Ex. A. No money had yet been paid. A subsequent field test performed on July 25, 2001 by the Michigan Department of Transportation concluded, "The workmanship at all four locations is extremely poor to totally unacceptable according to general industry standards" and "The thickness of the asphalt placed is not in conformance with industry standards." State Def.'s Mot. for Summ. J., Ex. L.

According to Dunham's police report, Dunham took Coutcher to the Hornfield residence. Present was a trailer registered to Mr. Herrin. Mr. Herrin then arrived on the scene, and was identified by Coutcher as the man who had provided a bid on his property. Mr. Herrin denied knowing the subjects who were working at Coutcher's residence. At his deposition, Mr. Herrin continued to deny knowing Mr. Coutcher or being involved in paving his driveway.

Dunham spoke to Violet Hornfield on July 12, 2001. His notes state, "They at the time seemed to be satisfied, however, their job was by far substandard. As I viewed the asphalt it was very course with holes in it and there were places were the asphalt was probably no more than 3/4 to 1/2 inch thick and it had only been down for approximately 3 days." State Def.'s Mot. for Summ. J, Ex. C.

Dunham also stopped at a residence on Murphy Lake Road that he perceived to have freshly laid asphalt. According to Dunham's police report, the woman stated that she had individuals who stopped by her home pave a portion of her driveway. Dunham wrote, "She paid $1500.00 which seemed to be reasonable for the job that they did." State Def.'s Mot. for Summ. J., Ex. A. She wrote the check out to Michael Herrin, the son of the plaintiffs.

On July 12, 2001, Dunham made contact with Marlene Stratton, who informed him that Ollie Herrin and "a crew of young people" had agreed to pave her driveway with two inches of asphalt for $1,650. State Def.'s Mot. for Summ. J., Ex. C. She complained that she was told contradictory stories about where the workers were from, but there is nothing in the police report that indicates the work was performed in an unsatisfactory way.

On July 14, 2001, after the vehicles had been seized, Meredith Partlo contacted the Michigan State Police and stated that she had paid two young males to fill cracks in her driveway. She made a check out for $50 payable to Ollie Herrin. Although she did not immediately view the quality of the work, "she has since noted that the filler used to do the job has run right out of the cracks and she is no better off than when she started." State Def.'s Mot. for Summ. J., Ex. A.

A supplemental police report dated July 12, 2001 states that "Sgt. STEVENSON was able to pick up complaints over the past 2 years involving a subject by the name of OLLIE HERRIN. All of them have to deal [sic] with the same type of incident of a paving scam. The incidents cover everything from the west side of the state to the Oscoda Sheriff's Dept. and in West Branch." State Def.'s Mot. for Summ. J., Ex. C. The police reports also contain a series of other incidents, none of which obviously implicate the Herrins.

Dunham requested that Detective Sergeant Pendergraff, also of the state police, locate the campground where certain suspects (Richard Williams, Sheila Williams and Ollie Herrin) were believed to be staying. Pendergraff identified three vehicles at lots at the Holiday Shores Resort Campground in Shiawassee County rented by these individuals. He wrote in a police incident report:

> I contacted Tpr Dunham with the above information. Tpr Dunham advised that, per his prosecutor, they wanted the dump truck, trailer and equipment seized. I contacted the Flint Post and requested a wrecker. Complete Towing responded and towed the above equipment to their impound lot. The equipment will be carried under the Caro Post complaint as property.

State Def.'s Mot. for Summ. J., Ex. E. A "PRIORITY MEMORANDUM" dated July 12, 2001, from Reene to Doug Lautner of the state police reads:

> Based upon the information I have received regarding the above reference complaint it appears that the activity at issue may be violative of MCL 750.159f et. seq. (Racketeering). Therefore, I request that you continue to retain all equipment, property and/or vehicles presently seized pending the completion of this investigation as all such items may be tangible physical evidence and thereafter subject to either civil or criminal forfeiture.

Pl.'s Resp. to State Def's Mot. for Summ. J., Ex. 5. A supplemental incident report dated July 14, 2001 by Trooper Dunham states:

> PROPERTY SEIZED BY MSP OWOSSO FOR MSP CARO PER PROSECUTOR MARK REENE:
> After doing an interview with one of the suspects in this matter and his wife, it was learned that they were staying at a campground some place that was believed to be in Genesee or Shiawassee County. Detective MARK PENTIGRAF from the Owosso Post located property belonging to OLLIE HERRIN in a trailer park known as the Holiday Shores Campground.
>
> At approximately 12:40pm, Detective PENTIGRAF from located campsites rented by approximately 5 people who all had come to the camp at one time. Some of the subjects had left as early as yesterday, some before that. Some subjects were paid up on their bill and some were not. Detective PENTIGRAF noticed a black Chevy dump truck with no plate on it and a Ready Haul trailer that was registered to a

-5-

> PATSY & OLLIE HERRIN. On the side of the truck were the words "Asphalt Paving 1-800-322-8389". Because of this vehicle's involvement in this matter was seized and towed to Complete Towing at 3401 N. Dort Hwy. in Flint, MI.
> . . .
> The above listed property was seized by the MSP Owosso Post for MSP Caro (Tpr Dunham's) complaint, per authorization of Tuscola County Prosecutor MARK REENE on 7-13-01.

Pl.'s Resp. to State Def's Mot. for Summ. J., Ex. 7.

The property seized was a 1999 Chevrolet dump truck, a 2001 GMC pickup truck, a 2001 flatbed trailer, a 1999 Premier trailer, a 2001 Bobcat skid loader, an asphalt roller, and various hand tools, all owned by the plaintiffs. The vehicles were seized without a warrant and were taken to Complete Towing in Flint for storage. They were searched on July 17, 2001, by Trooper Dunham after obtaining a search warrant.

Four days later, defendant Dunham obtained a warrant from a state magistrate to search the vehicles for evidence of the identity of the owner pursuant to an investigation of fraudulent activities being committed by persons in the asphalt paving business. No criminal charges were ever filed against the plaintiffs.

Mr. Dunham informed Mary Sain, owner of Complete Towing, that the property was the subject of a criminal investigation. Reene testified that Ms. Sain would call him to check on the status of the criminal investigation. Mr. Reene testified that typically the towing facility would keep an item seized pursuant to a criminal investigation until they received word from the prosecutor's office, the law enforcement agency, or a court order. He denies that he ever told her to refuse to comply with a court order.

Mr. Herrin testified that he repeatedly requested that Mr. Reene release his property, beginning as early as late July 2001. He went through a number of lawyers during this time as well

(including, he claims, "that lawyer which Jack Kevorkian had,"Pl.s' Resp. to County Def.'s Mot. for Summ. J., Ex. 4, Ollie Herrin Dep. at 36, and "that lawyer out there from Wyoming, . . . Jerry Spence," *id.* at 58).

In October 2001, a court apparently ordered that the 1999 dump truck be released. When the plaintiffs went to Complete Towing to attempt to retrieve the vehicle, however, they were told by Ms. Sain that there was a "prosecutor's hold on it." Pl.s' Resp. to Mot. for Leave to File Ans., Ex. 3, Pansey Herrin Dep. 19. Mr. Reene denies ever telling Ms. Sain to refuse to comply with the court order. However, he did tell her that they were just beginning a criminal case and remembers thinking that he "thought the order at that time didn't make sense . . . because of the ongoing criminal case." Pl.s' Resp. to County Def.'s Mot. for Summ. J., Ex. 5, Reene Dep. at 46, 48.

In 2003, Mr. Herrin went to Complete Towing and requested that his vehicles be released. Ms. Sain refused, stating that Mr. Reene had issued a hold on the property. In late November 2004, the plaintiffs received a Notice of Abandoned Vehicle for the two trailers. A hearing was held on January 19, 2005 in the Tuscola County district court, at which the state court judge ruled that the seizure of the property was improper. The state judge stated:

> The court finds based on what's been presented at the hearing here today that, number one, the vehicles haven't been abandoned, and number two, they were improperly removed. There was no criminal prosecution that occurred as a result of the removal, and nobody apparently did anything thereafter. I mean, there comes some point in time where – and I guess reasonableness is the key – that somebody has to make a determination what's gonna happen. And it appears to me that the owners made some inquiry over the course of the last two years to determine where the property was, if it could be released. At one point in time they were told that it's being held pursuant to criminal investigation. Later it appears that the towing facility, or storage facility is indicating it's being held. Then they indicate there's a prosecutor's release. At some point in time Mr. Wanink [of Tuscola County prosecutor's office] believes his office did release it, although we don't have any record of that at this point.

> So I'm finding number, two things – number one, based on the record, that the property, or the vehicles were not properly deemed abandoned or removed. I'm ordering the vehicles to be immediately released to the owner, Ollie Herrin; and I'm not making a determination as to the law enforcement agency's [sic] responsible for any accrued charges.

Pl.s' Resp. to State Def.s' Mot., Ex. 12, 10-11. The court further found that the Michigan State Police was responsible for the entire charge by Complete Towing.

The two trailers and the asphalt roller were returned to the plaintiffs on February 2, 2005. The two trucks were released but had been repossessed by the bank because the plaintiffs had stopped making payments. The Bobcat vehicle was sold by the bank while it was still under the control of Complete Towing. The hand tools have not been returned.

Mr. Herrin claims that the trailer sustained damage:

> The refrigerator was messed up onto it. They let the blood all dry into it and stuff. They took and tried to pry the glass door open with a crowbar, and it was that far open and the water all got in the rug. It had a slide-out on it what [sic] you push with electric, and it was like that much from being closed and the water all got in the couch. They left the small door open on the back of the trailer.
>
> It has a bathroom that you flip the battery on like if you're in a campsite, and the water all got in there. And the battery had froze up and busted and leak out all that. And the water all came in underneath the bed. And ice had froze around the railings of the trailer and pushed the railings. The metal have, oh, something like that. . . .

Pl.s' Resp. to County Def.'s Mot. for Summ. J., Ex. 4, Ollie Herrin Dep. 47.

The complaint was filed on September 15, 2005. On November 21, 2005, Dunham, Pentigraff, and the Michigan State Police filed a motion to dismiss because the claim was barred by the statute of limitations, and therefore failed to state a claim upon which relief may be granted. On March 30, 2007, after a report and recommendation from the magistrate judge, the Court denied this motion. On October 29, 2007, the plaintiffs moved for partial summary judgment against Dunham,

Pentigraff, and the Michigan State Police for failing to file an answer after their motion to dismiss was denied. On October 30, 2007, Dunham, Pentigraff, and the Michigan State Police filed a motion for leave to file a late answer, which was granted by the magistrate judge on December 12, 2007. No objections were filed, and the defendants filed their answer, raising sovereign immunity and qualified immunity as affirmative defenses.

On January 22, 2008, the plaintiffs filed a motion for leave to amend their complaint to clarify that they were proceeding against the defendants in both their individual and official capacities. The magistrate judge heard oral argument on the motions on January 23, 2008.

On February 26, 2008, the magistrate judge denied the plaintiffs' motion to amend their complaint due to untimeliness. The plaintiffs filed a timely appeal of that order. On March 17, 2008, the magistrate judge filed his report on the summary judgement motions, recommending that they be granted on several grounds, although he recommended denial of prosecutorial immunity for defendant Reene's illegal acts of authorizing the seizure and continued detention of the property without a warrant and without pursuing a criminal investigation. Defendant Reene did not object to that part of the recommendation.

II.

Objections to a report and recommendation are reviewed *de novo*. 28 U.S.C. § 636(b)(1). The Sixth Circuit has stated that "[o]verly general objections do not satisfy the objection requirement." *Spencer v. Bouchard*, 449 F.3d 721, 725 (6th Cir. 2006). "The objections must be clear enough to enable the district court to discern those issues that are dispositive and contentious." *Miller v. Currie,* 50 F.3d 373, 380 (6th Cir.1995). "'[O]bjections disput[ing] the correctness of the

magistrate's recommendation but fail[ing] to specify the findings . . . believed [to be] in error' are too general." *Spencer*, 449 F.3d at 725 (quoting *Miller*, 50 F.3d at 380).

The Court finds that one issue is dispositive: the plaintiffs' claim accrued at the time of the seizure of the property, and the complaint was not filed within the prescribed statute of limitations. The Court previously ruled otherwise, determining that the statute of limitations did not accrue until the property was returned, reasoning:

> As the magistrate judge correctly noted, "'[t]ypically the statute of limitations for filing an action alleging an unconstitutional search and seizure begins to run at the time of the injury,' when the plaintiff becomes aware of the unconstitutional action." *Wolf v. Perry*, 412 F.3d 707, 714 (6th Cir. 2005) (quoting *Shamaeizadeh v. Cunigan*, 182 F.3d 391, 394 (6th Cir. 1999)). "When a defendant's wrongful acts are of a continuing nature, however, the statute of limitations does not run until the wrong is abated." *Sable v. General Motors Corp.*, 90 F.3d 171, 176 (6th Cir. 1996). "A continuing wrong is established by continuing tortious acts, not by continual harmful effects from an original, completed act." *Village of Milford v. K-H Holding Corp.*, 390 F.3d 926, 933 (6th Cir. 2004).
>
> The plaintiffs allege an unconstitutional seizure of their property. "[A] seizure of property occurs when 'there is some meaningful interference with an individual's possessory interests in that property'. . . . This expansive definition is necessary because a seizure threatens an individual's distinct interest in retaining possession of his or her property" *Thomas v. Cohen*, 304 F.3d 563, 569-70 (6th Cir. 2002) (quoting *United States v. Jacobsen,* 466 U.S. 109, 113 (1984)). The seizure of property continues until the interference ends. While the property at issue in this case was initially seized on July 13, 2001, the county retained possession of the property until February 2, 2005, when two trailers and an asphalt roller were released to the plaintiffs. The plaintiffs allege "that no other property has yet been returned to" them. Pl.'s Compl. at ¶ 9. The seizure of these items continued until their release. Thus, the statute of limitations has not expired on these claims.

Order Rejecting Mag. J. Rep. & Rec. 5-6.

Normally, the Court's previous ruling would have settled the issue under the law of the case doctrine. The law of the case doctrine "states that 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'"

*Patterson v. Haskins*, 470 F.3d 645, 660-61 (6th Cir. 2006) (quoting *Moses v. Bus. Card Express, Inc.*, 929 F.2d 1131, 1137 (6th Cir. 1991)). "'Law-of-the-case rules have developed to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit.'" *Rosales-Garcia v. Holland*, 322 F.3d 386, 398 n.11 (6th Cir. 2003) (quoting 18B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4478 (2d ed. 2002)).

There are three exceptions to the law of the case doctrine. A court may "reconsider a ruling: (1) where substantially different evidence is raised on subsequent trial; (2) where a subsequent contrary view of the law is decided by the controlling authority; or (3) where a decision is clearly erroneous and would work a manifest injustice." *Hanover Ins. Co. v. Am. Eng'g Co.*, 105 F.3d 306, 312 (6th Cir. 1997). A court errs "in adhering to law of the case doctrine despite intervening Supreme Court precedent." *Agostini v. Felton*, 521 U.S. 203, 236 (1997).

Since the Court's last decision on this issue, the Supreme Court decided *Wallace v. Kato*, 127 S. Ct. 1091 (2007). That case dealt with a claim for a false arrest, which is analogous to the claim here. The Court held that "the statute of limitations upon a § 1983 claim seeking damages for a false arrest in violation of the Fourth Amendment, where the arrest is followed by criminal proceedings, begins to run at the time the claimant becomes detained pursuant to legal process." *Id.* at 1100.

Based on that rationale, the Court must conclude that the plaintiffs' claims accrued at the time of the seizure of their property. "[I]n actions brought under § 1983, '[t]he statute of limitations commences to run when the plaintiff knows or has reason to know of the injury which is the basis of his action.'" *Kelly v. Burks*, 415 F.3d 558, 561 (6th Cir. 2005). "In determining when the cause of action accrues in § 1983 cases, we look to the event that should have alerted the typical lay person

-11-

to protect his or her rights." *Trzebuckowski v. City of Cleveland*, 319 F.3d 853, 856 (6th Cir. 2003). That event in this case was the illegal seizure, which occurred on July 13, 2001. The plaintiffs' argument that their claim did not accrue until their property was returned, albeit in a damaged state, or when the state court ordered the return, must be rejected. It is the illegal seizure that triggered this claim, even though the effects of those police actions may have continued into the future. Courts must take note of "the subtle difference between a continuing violation and a continuing effect of a prior violation." *Trzebuckowski*, 319 F.3d at 858.

The Sixth Circuit held that a claim challenging an ordinance that allegedly diminished property value was not a continuing violation; rather, the claim for unlawful taking and substantive due process accrued when the ordinance was passed. *Kuhnle Brothers, Inc. v. County of Geauga*, 103 F.3d 516, 521 (6th Cir. 1997) ("If Resolution 91-87 did, in fact, 'take' any property interests belonging to Kuhnle, that taking occurred when the resolution was enacted."). However, the plaintiff's claim that he was deprived of the liberty of traveling interstate began again each day the ordinance was in effect. *Id.* at 522.

In an unpublished case, the Sixth Circuit has suggested that the statute of limitations for a Fourth Amendment claim of unlawful police seizure "accrued no later than" when seized items were returned to the plaintiffs. *Crowe v. Winchester Police Dept.*, 238 F.3d 420 (6th Cir. Nov. 6, 2000) (table). In another unpublished case, the Sixth Circuit suggested that the statute of limitations accrued for property unlawfully taken by forfeiture proceedings when those proceedings began, because "a statute of limitations begins to run when the plaintiff knows or has reason to know of the injury that is the basis of his action." *Hawkins v. Czarnecki*, 142 F.3d 434, 1998 WL 57333, at *3 (6th Cir. Feb. 2, 1998) (table).

Other courts have held that the statute of limitations for wrongfully retained property accrues when the plaintiff learns of the seizure. *Kripp v. Luton*, 466 F.3d 1171, 1175-76 (10th Cir. 2006) (holding that claim accrued when the plaintiff learned of the seizure or "[a]t the very latest . . . when [the plaintiff] filed for return of his property."); *Gonzalez-Alvarez v. Rivero-Cubano*, 426 F.3d 422, 426 (1st Cir. 2005) (holding that claim for deprivation of property due to cancellation of an administrative license accrued when license was cancelled). These cases, viewed in light of the Supreme Court's subsequent pronouncement in *Wallace v. Kato*, provide sufficient reason for the Court to revisit its conclusion about the accrual of the statute of limitations.

Because they did not file suit until September 15, 2005, more than three years after the seizure of their property, *McCune v. City of Grand Rapids*, 842 F.2d 903, 905-06 (6th Cir. 1988), their claim is time-barred.

This ruling renders unnecessary a discussion of the other issues discussed in the magistrate judge's report and recommendation and the plaintiffs' objection to the order denying leave to amend the complaint.

III.

The Court finds that the plaintiffs' claims against the defendants were filed out of time.

Accordingly, it is **ORDERED** that the report and recommendation of the magistrate judge [dkt # 57] is **ADOPTED** with respect to the statute of limitations issue.

It is further **ORDERED** that the plaintiffs' objections to the recommendation [dkt #58] are **OVERRULED**.

It is further **ORDERED** that the defendants' motions for summary judgment [dkt #32, 34] are **GRANTED** as to the statute of limitations defense only.

It is further **ORDERED** that the case is **DISMISSED WITH PREJUDICE**.

s/David M. Lawson<br>
DAVID M. LAWSON<br>
United States District Judge

Dated: July 10, 2008

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 10, 2008.

s/Felicia M. Moses
FELICIA M. MOSES

---